UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
SECURITIES AND EXCHANGE
COMMISSION,

                                    Plaintiff,


              v.                                              **REPORT AND**
                                                              **RECOMMENDATION**
GIUSEPPE PINO BALDASSARRE,                                    CV 11-5970 (ARR)(VVP)
ROBERT MOUALLEM, and MALCOLM
STOCKDALE,

                                    Defendants.
-------------------------------------------------------------x

**POHORELSKY, Magistrate Judge:**

       Judge Allyne R. Ross has referred to me for a Report and Recommendation, pursuant to

Title 28 U.S.C § 636(b)(1), the Securities and Exchange Commission's ("SEC" or "Commission")

motion for a default judgment against Malcolm Stockdale ("defendant").  The SEC brings this civil

enforcement action against the defendant based upon allegations that he and two co-conspirators

(collectively, "the defendants") engaged in a fraudulent scheme to manipulate the market for their

stock by bribing stockbrokers into making supra-competitive purchases and orchestrating "matched

orders" that would generate a false appearance of demand for their stock.  The defendant has been

duly served and has taken no action with respect to this case for over two years.  Accordingly, the

SEC now moves for the entry of default against him, seeking various forms of relief including an

injunction barring the defendant from further violating the federal securities laws, a penny stock bar,

disgorgement of his ill-gotten profits, and a civil penalty of $150,000.   For the reasons discussed

below, I respectfully recommend that the SEC's motion for a default judgment be granted, that their

requested injunctive relief be granted, and that a civil penalty of $50,000 be entered against the

defendant.  Should the SEC provide evidence supporting its account of the defendant's alleged

profits, the court further recommends disgorgement in the amount of $20,335 along with $2,643.55

in prejudgment interest.

**BACKGROUND**

*I. Facts*

The defendant, 68, is a resident of Prince Edward Island, Canada and was at all relevant times a stockholder of Dolphin Digital Media ("Dolphin"). Compl. ¶¶ 2, 12. Dolphin was a corporation with stock registered with the SEC pursuant to Section 12(g) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78l(g), and quoted on the Over the Counter Bulletin Board. *Id.* at ¶ 15. As of March 26, 2010, Dolphin stock was trading at 30 cents a share. *Id.* at ¶ 37.

The uncontested facts establish that between October 2009 and April 2010, the defendant was party to an arrangement that he hoped would allow him to profitably divest himself of his ample Dolphin stock holdings. Partnering with his stockbroker Robert Mouallem, Dolphin's former President and Chief Executive Officer Pino Baldassarre, and an unnamed cooperating witness, the defendant agreed to pay "Individual A" (an undercover FBI agent) a 30% kickback for arranging the sale of up to seven million shares of Dolphin stock. *Id.* at ¶¶ 29-35; Pl.'s Mot. 1. The defendant and his co-conspirators agreed to the stock sale arrangement based on an understanding that Individual A would use a portion of his kickback proceeds to bribe individual stockbrokers into purchasing Dolphin stock on their clients' behalf. *Id.* at ¶ 34-35. The defendants understood that the actual investors would not be informed of the kickback payments, and expressly agreed to withhold this information themselves. *Id.* at ¶ 35.

Once arrangements were in place, Mouallem then orchestrated a series of matched trades between March 31 and April 6, 2010, directing Individual A to place buy orders and directing the size, price, and timing of each order so that Mouallem could simultaneously place equivalent sell orders. *Id.* at ¶¶ 40-44. The purpose of matching these transactions was to artificially inflate Dolphin's stock price over time by generating the appearance of market activity. On April 9, 2010,

Baldassarre paid Individual A approximately $11,440 in exchange for arranging the sale of roughly 105,000 shares at a total price of $38,100 over that week.  *Id.* at ¶¶ 42, 45.

Had the conspiracy been allowed to proceed, Baldassarre and the defendant intended to sell the remainder of their stock at a price of at least 60 cents a share, thereby reaping $3 to $4 million in profits while allowing their buyers to suffer the losses once Dolphin's stock inevitably returned to normal trading prices.  *Id.* at ¶ 36.

## II. Procedural History

This action was commenced by the SEC on December 7, 2011.  Dkt. Ent. 1.  On January 1, 2012, the SEC attempted to serve the summons and complaint on the defendant pursuant to the Hague Convention by sending a Request for Service Abroad of Judicial or Extrajudicial Documents to the Attorney General of Prince Edward Island in Canada.  Dkt. Ent. 30-3; *see also* Fed. R. Civ. P. 4(f); Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, Art. 1 *et seq.*  Canadian authorities made four unsuccessful attempts to serve the defendant at his home before concluding on February 15, 2012 that the home had been vacated. Dkt. Ent. 18-3.  On March 22, 2012, an SEC representative attempted to serve the defendant by emailing him a copy of the summons and complaint, also to no avail.  Dkt. Ent. 18-4.  Having failed to locate and serve the defendant by traditional means, the SEC then moved on April 26, 2012 to serve Stockdale by publication.  Dkt. Ent. 18.  I granted that motion and entered an order permitting the Commission to effectuate service on the defendant by publishing notice in the *International Herald Tribune* and the *Toronto Star* one day a week for four weeks.  Dkt. Ent. 19.  The Commission complied with the court's order before filing a Declaration of Service on July 13, 2012.  Dkt. Ent. 21.  Accordingly, the Clerk of Court entered a Notation of Default against the defendant on September 12, 2012.  Dkt. Ent. 24.

Stockdale's co-defendants entered into civil settlement agreements resolving the claims against them in this case on August 16, 2013.  Dkt. Ents. 36-37.  Around the same time, a letter motion was made by the defendant's assigned criminal counsel, indicating that the defendant had surrendered himself on August 1, 2013 from Mexico, where he had been residing, and seeking a temporary stay in this case.  Dkt. Ent. 34.  I denied that motion and set a briefing schedule that provided the defendant with an opportunity to oppose the SEC's motion for a default judgment.  Dkt. Ent. 40.  Papers in opposition were never filed.

On November 26, 2013, the defendant pleaded guilty to one count of conspiracy to defraud in a parallel criminal action, and was sentenced to time served plus one year of supervised release and ordered to pay $26,610 in forfeiture.  *United States v. Stockdale, et al.,* No. 11-CR-0801 (E.D.N.Y. 2013), Dkt. Ents. 181, 193.  Other than the motion to stay made shortly after his arrest, the defendant has taken no action with regard to this civil case.

## DISCUSSION

### I. Entry of Default Judgment

The court begins by setting forth the framework governing the entry of a default judgment and the establishment of liability against a defaulting party.  Rule 55(a) of the Federal Rules of Civil Procedure provides that "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default."  Fed. R. Civ. P. 55(a).  Rule 55 sets forth a two-step process for an entry of default judgment.  *See Enron Oil Corp. v. Diakuhara,* 10 F.3d 90, 95–96 (2d Cir. 1993).  First, the Clerk of Court enters the default by noting the party's default on the Clerk's record of the case.  *See id.*  Second, if that party still fails to appear or otherwise move to set aside the default pursuant to Rule 55(c), the court may enter a default judgment.  *See* Fed. R. Civ. P. 55(b).

Because courts strive to "afford[ ] litigants a reasonable chance to be heard," *Diakuhara,* 10 F.3d at 96, a default judgment is considered an extreme remedy that should only be entered as a last resort. Accordingly, a plaintiff is not entitled to a default judgment as a matter of right simply because a party is in default. *See Meehan v. Snow,* 652 F.2d 274, 277 (2d Cir. 1981); *Erwin DeMarino Trucking Co. v. Jackson,* 838 F.Supp. 160, 162 (S.D.N.Y.1993) (noting that courts must "supervise default judgments with extreme care to avoid miscarriages of justice"). Rather, courts must balance the competing interests at stake by weighing a number of factors, including (1) the amount of money involved; (2) whether issues of fact or of substantial public importance are at issue; (3) whether the default is largely technical; (4) whether the plaintiff has been substantially prejudiced by the delay; (5) whether the grounds for default are clearly established; (6) whether the default was caused by a good-faith mistake or excusable neglect; (7) how harsh an effect default would have; and (8) whether the court believes it later would be obligated to set aside the default on defendant's motion. *Cablevision of Southern Connecticut v. Smith,* 141 F. Supp. 2d 277, 281 (D. Conn. 2001) (citing Moore's Federal Practice § 55.20 (2)(b) (3d ed. 1999)); *see also Au Bon Pain Corp. v. Artect, Inc.,* 653 F.2d 61, 62 (2d Cir. 1981). In civil actions, when a party fails to appear after given notice, the court normally has justification for entering default. *Bermudez v. Reid,* 733 F.2d 18, 21 (2d Cir. 1984).

The entry of a default judgment is unquestionably appropriate in this case, as the defendant has consciously absented himself from both the United States and Canada in an effort to evade the criminal and civil charges brought against him. Having delayed resolution of this case for over two years through this bad faith conduct, the defendant has effectively waived his right to now present arguments in his defense. The SEC duly notified the defendant by substituted service and allowed an additional 18 months to pass since the Clerk of Court entered a Notation of Default. Now out of hiding and on actual notice of this litigation, the defendant has still failed to address the charges

against him.  Accordingly, the Commission is now entitled to the entry of a default judgment against

him.

## II. Defendant's Liability

Having recommended that the defendant be found in default, I now turn to the claims made

against him.  In considering a motion for default judgment and damages, "the well-pleaded factual

allegations of the complaint are taken as true, except those relating to damages."  *Thomas v. Sclavo*,

No. CV-94-1568, 1998 WL 51861, at *3 (N.D.N.Y. Feb. 4, 1998) (citing *Au Bon Pain Corp. v. Artect,*

*Inc.*, 653 F.2d 61, 65 (2d Cir. 1981)).  "[H]owever, it remains for the court to consider whether the

unchallenged facts constitute a legitimate cause of action, since a party in default does not admit

mere conclusions of law."  10A Charles Alan Wright & Arthur R. Miller, Federal Practice and

Procedure § 2688 (3d ed. 1998); *accord Pitts v. Seneca Sports, Inc.*, 321 F. Supp. 2d 1353, 1357 (S.D. Ga.

2004) (citation omitted); *In re Industrial Diamonds Antitrust Litig.*, 119 F. Supp. 2d 418, 420 (S.D.N.Y.

2000) (citation omitted).  "In other words, 'a default is not treated as an absolute confession by the

defendant of his liability and of the plaintiff's right to recover.' "  *W.A.W. Van Limburg Stirum v.*

*Whalen*, No. CV-90-1279, 1993 WL 241464, at *4 (N.D.N.Y. June 29, 1993) (quoting *Nishimatsu*

*Construction Co. v. Houston*, 515 F.2d 1200, 1206 (5th Cir. 1975)).  "Before judgment can be entered,

the court must determine whether plaintiff's factual allegations are sufficient to state a claim for

relief on each of the causes of action for which the plaintiff seeks judgment by default."  *Id.* (citing

*Weft, Inc. v. G.C. Investment Associates,* 630 F. Supp. 1138, 1141 (E.D.N.C. 1986)).

The SEC contends that the defendant has violated Section 17(a) of the Securities Act of

1933, 15 U.S.C. § 77q(a), and Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), together with

Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder.  To succeed on its Section 10(b) and

Rule 10b-5 claim, the SEC's complaint must sufficiently allege that the defendant "(1) made a

material misrepresentation or a material omission as to which he had a duty to speak, or used a

fraudulent device; (2) with scienter; (3) in connection with the purchase or sale of securities." *SEC v. Monarch Funding Corp.,* 192 F.3d 295, 308 (2d Cir. 1999) (citation omitted). Additionally, it must allege that some "means or instrumentality of interstate commerce" was used in connection with the fraud in order to provide this court with jurisdiction. 17 C.F.R. § 240.10b-5. The SEC's claim under Section 17(a) must allege "[e]ssentially the same elements . . . in connection with the offer or sale of a security, though no showing of scienter is required for the SEC to obtain an injunction under subsections (a)(2) or (a)(3)." *Monarch,* 192 F.3d at 308; *also SEC v. First Jersey Sec., Inc.,* 101 F.3d 1450, 1467 (2d Cir. 1996).[1]

Each of the required elements described above is satisfied here. First, the defendant made a material omission by concealing from investors his efforts to bribe their stockbrokers in exchange for purchasing his Dolphin stock. Information is material if a reasonable investor would consider it important in the decision to buy or sell securities. *Basic, Inc. v. Levinson,* 485 U.S. 224, 231-32 (1988). Under this standard, a reasonable investor would certainly consider the knowledge that her stockbroker was receiving kickbacks to be important in deciding whether to buy the at-issue stock, since such payments necessarily affect a stockbroker's judgment. *See SEC v. Savino,* No. CV-01-2438, 2006 WL 375074, at *13-14 (S.D.N.Y. Feb. 16, 2006) (brokerage firms "entitled to know" that their employees exchanged "cash, gifts, and gratuities . . . in connection with trades"); *In re Stephens, Inc.,* 68 S.E.C. Docket 1801, 1998 WL 807950, at *7 (Nov. 23, 1998) (secret kickback arrangements material because "they are always corrupting"); *SEC v. Softpoint, Inc.,* 958 F. Supp. 846, 863 (S.D.N.Y. 1997) ("[A]n apparent kickback agreement between an issuer and an underwriter is material because it 'raises an inherent conflict of interest.' ") (quoting *SEC v. Scott,* 565 F. Supp. 1513, 1527 (S.D.N.Y.1983), *aff'd sub nom. SEC v. Cayman Islands Reinsurance Corp.,* 734 F.2d 118 (2d Cir. 1984)); *In*

---

[1] Private securities fraud actions also require plaintiffs to show that they relied on the fraudulent misstatements or omissions as an essential element of their claim. This requirement is not understood to extend to civil enforcement actions undertaken by the SEC, however. *SEC v. Richetelli,* No. 3:09–cv–361, 2010 WL 2802911, at *4-6 (D. Conn. Jul. 12, 2010); *S.E.C. v. Simpson Capital Management, Inc.,* 586 F. Supp. 2d 196, 208 n.4 (S.D.N.Y. 2008).

*re First Fidelity Sec. Group,* 61 S.E.C. Docket. 40, 1996 WL 20840, at \*7 (Jan. 9, 1996) (secret payments to agent material "because such arrangements and payments could compromise the independence and judgment of these agents").  A reasonable investor would also want to know that the sudden appearance of interest in Dolphin stock was being artificially driven by the coordination of matched orders.  *See Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 205 n.25 (1976) (defining "matched orders" as "orders for the purchase sale of a security that are entered with the knowledge that orders of substantially the same size, at substantially the same time and price, have been or will be entered by the same or different persons for the sale/purchase of such security"); *also Jay Dees Inc. v. Defense Technology Systems, Inc.,* No. CV-05-6954, 2008 WL 4501652, at \*4 (S.D.N.Y. Sept. 30, 2008) ("The creation of matched orders is one of many schemes by which an individual may covertly insert material misrepresentations into the securities market."); *SEC v. Ficeto,* 839 F. Supp. 2d 1101, 1111 (C.D. Cal. 2011) (matched orders prohibited by the Exchange Act because they are "intended to mislead investors by artificially affecting market activity") (citation omitted).  Stockdale agreed that, through an intermediary, stockbrokers who arranged the sale of Dolphin stock would receive a kickback for each sale, and allowed his stockbroker Mouallem to direct the size, price, and timing of the buy orders in order to match them to his sell orders.  Compl. at ¶¶ 33-35, 43-44.  He further acknowledged, and agreed, that he would not disclose any of these arrangements to any buyers of the stock.  *Id.* at ¶¶ 33, 35.  The defendant therefore fully agreed to a scheme involving material omissions of fact.

Second, the defendant made these omissions with the requisite scienter.  Scienter is defined as "a mental state embracing intent to deceive, manipulate or defraud."  *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193 n.12 (1976).  The defendant's scienter is well-established here by his overt and completed efforts to help bribe Individual A, Compl. at ¶¶ 33, 45, by his agreement to conceal these bribes from buyers, *id.* at ¶ 35, and by his stated intent of earning three to four million dollars by

-8-

driving up the price of Dolphin stock through this fraudulent scheme, *id.* at ¶ 38. The defendant acted with the full knowledge and express purpose of defrauding investors. Accordingly, the requirement of scienter is satisfied.

Third, the defendant's material omissions were made in connection with sale of securities. The "in connection with" requirement is read broadly to encompass a range of securities-related fraudulent activities, but is generally satisfied so long as the fraud goes to the value of the security or the nature of the consideration paid. *SEC v. Zandford,* 535 U.S. 813, 819 (2002); *Chemical Bank v. Arthur Andersen & Co.,* 726 F.2d 930, 943 (2nd Cir. 1984). Thus, the concealment of a kickback arrangement intended to induce the purchase of stock is clearly done in connection with the sale of securities, since it will influence brokers to buy Dolphin stock at higher prices than they otherwise would have, without affording investors the opportunity to know of – much less object to – the secret arrangement. *See, e.g., U.S. v. Rudi,* 902 F. Supp. 452, 457 (S.D.N.Y. 1995). Accordingly, this element is also satisfied.

Finally, by using the telephone to orchestrate their fraudulent scheme, the defendants used an "instrument" or "instrumentality" of interstate commerce. 15 U.S.C. § 77q; 15 U.S.C. § 78j; 17 C.F.R. § 240.10b-5. Mouallem originally agreed to the kickback arrangement during a telephone conversation with Individual A on February 26, 2010. Compl. ¶¶ 29-31. Baldassarre and the defendant expressly consented to this arrangement, and agreed to keep it a secret from purchasers, on another phone call with Individual A on March 26, 2010. *Id.* at ¶¶ 34-35. Finally, Mouallem spoke with Individual A over the phone on March 31, 2010 to coordinate the first significant purchase of Dolphin shares. *Id.* at ¶¶ 39-40. The SEC's complaint does not specifically allege that the parties were located in different states when these phone calls took place, but such an allegation is not required. Because Sections 10(b) and 17(a) modify the word "instrumentality" with the phrase "*of* interstate commerce" and not "*in* interstate commerce," even purely intrastate telephone calls are

sufficient to confer jurisdiction. *Heyman v. Heyman,* 356 F.Supp. 958, 969 (S.D.N.Y. 1973) (collecting cases). Additionally, "it is well settled that the fraud itself need not be transmitted through the jurisdictional means. All that is necessary is that the designated means be used in some phase of the transaction, which need not be the part in which the fraud occurs." *Richter v. Achs,* 962 F. Supp. 31, 33 (S.D.N.Y. 1997) (quoting *Heyman,* 356 F. Supp. at 969). Because the defendant and his co-conspirators in this case communicated by telephone to plan their fraudulent scheme, this jurisdictional element is satisfied.

Accordingly, the court respectfully recommends that the defendant be held liable for violations of Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act based on his willful participation in the fraudulent kickback and matched orders scheme.

### III. Relief Requested

The SEC seeks various forms of relief, should it prevail on its underlying claims, including a permanent injunction barring the defendant from violating the federal securities laws in the future, a penny stock bar, an order of disgorgement in the amount of $31,775 plus prejudgment interest, and a civil monetary penalty in the amount of $150,000. Pl.'s Mem. 10-17, Dkt. Ent. 30.

Before addressing the propriety of these remedies, the court begins by outlining the appropriate standard to be applied. Upon the entry of a default judgment, it is the plaintiff's burden to establish entitlement to recovery. *See Clague v. Bednarski,* 105 F.R.D. 552, 552 (E.D.N.Y. 1985). "While a default judgment constitutes an admission of liability, the quantum of damages remains to be established by proof unless the amount is liquidated or susceptible of mathematical computation." *Levesque v. Kelly Communications, Inc.,* No. CV-91-7045, 1993 WL 22113, at *4 (S.D.N.Y. Jan. 25, 1993) (quoting *Flaks v. Koegel,* 504 F. 2d 702, 707 (2d Cir. 1974)). Courts must make an independent assessment of damages when deciding a motion for default judgment. Fed. R. Civ. P. 55(b); *see SEC v. Mgmt. Dyn., Inc.,* 515 F.2d 801, 814 (2d Cir. 1975). Damages may be proven

through an evidentiary hearing or through affidavits and other documentary submissions that provide a factual basis for determining the amount of damages to be awarded. *See Greyhound Exhibitgroup v. E.L. U.L. Realty Corp.,* 973 F.2d 155, 158 (2d Cir. 1992); *Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp.,* 109 F.3d 105, 111 (2d Cir. 1997) ("We have held that, under rule 55(b)(2), 'it [is] not necessary for the District Court to hold a hearing, as long as it ensure[s] that there was a basis for the damages specified in the default judgment.' ") (citing *Fustok v. ContiCommodity Services Inc.,* 873 F.2d 38, 40 (2d Cir. 1989)).

Here, the SEC does not seek damages, but rather injunctive relief, disgorgement, and a punitive penalty. For each, the court applies the same standard as it does for damages. *See SEC v. Mgmt. Dyn., Inc.,* 515 F.2d 801, 814 (2d Cir. 1975). The court addresses each claim for relief in turn.

## A. Permanent Injunction

The SEC seeks a permanent injunction barring the defendant from future violations of the federal securities laws. Both Section 20(b) of the Securities Act, 15 U.S.C. § 77t(b), and Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(1) provide that "upon a proper showing a permanent or temporary injunction or restraining order shall be granted." The court enjoys wide discretion to enjoin possible future violations of the federal securities laws upon a finding that it is reasonably likely that further violations will occur. *SEC v. Commonwealth Chem. Sec., Inc.,* 574 F.2d 90, 99-100 (2d Cir. 1978); *SEC v. Manor Nursing Centers, Inc.,* 458 F.2d 1082, 1100 (2d Cir. 1972); *SEC v. Savino,* No. CV-01-2438, 2006 WL 375074, at *16 (S.D.N.Y. Feb. 16, 2006). At the outset, the defendant's fraudulent past conduct gives rise to an inference of a reasonable likelihood of continued violations. *SEC v. Manor Nursing Ctrs., Inc.,* 458 F.2d 1082, 1100 (2d Cir. 1972). Additional factors that may be considered include "the degree of scienter involved, the sincerity of defendant's assurances against future violations, the isolated or recurrent nature of the infraction, defendant's recognition of the wrongful nature of his conduct, and the likelihood, because of

-11-

defendant's professional occupation, that future violations might occur." *SEC v. Universal Major Indus. Corp.,* 546 F.2d 1044, 1048 (2d Cir. 1976). Here, because the defendant has failed to present himself for this action, he has not provided any assurances against future violations. Further, although the defendant's decision to flee justice may evince a "recognition of the wrongful nature of his conduct," that certainly does not qualify it as a mitigating factor. Rather, the defendant's decision to abscond to Mexico rather than face the consequences of his fraudulent and harmful conduct evinces a sociopathic "nothing to lose" mentality that makes further violations seem particularly likely. On the other hand, there is some evidence suggesting that the defendant is only a novice fraudster whose primarily role in the kickback scheme was simply to supply the stock and reap the profits, while allowing Mouallem and others to actually engineer and execute the plan. If true, this would tend to suggest that recurrence is less likely. However, the defendant's decision to abscond, viewed in conjunction with his high degree of scienter throughout the formulation and partial execution of the conspiracy, leads the court to conclude that there is sufficient evidence to suggest that he is reasonably likely to commit further violations of the Securities and Exchange Acts. Accordingly, the court recommends that the SEC's requested injunction be granted.

### B. Penny Stock Bar

The SEC also seeks to prohibit the defendant from engaging in future offerings of penny stock. A court may order a penny stock bar "against any person participating in, or, at the time of the alleged misconduct who was participating in, an offering of penny stock." 15 U.S.C. §§ 77t(g), 78u(d)(6)(A). At all relevant times, Dolphin was a "penny stock" within the meaning of the Exchange Act, since it did not sell at or above five dollars per share and had average revenue of less than $6 million and net tangible assets of under $2 million. Pl.'s Mot. 16 (citing 15 U.S.C. § 78c(51)(A), 17 C.F.R. § 240.3a51-1). Courts typically consider six factors when deciding whether to impose such a bar: (1) the egregiousness of the securities law violation, (2) the defendant's repeat

offender status, (3) the defendant's role in the violation, (4) the defendant's scienter, (5) the defendant's economic stake in the violation, and (6) the likelihood that the misconduct will reoccur. *SEC v. Universal Exp., Inc.,* 475 F. Supp. 2d 412, 429 (citing *SEC v. Wolfson,* No. CV-02-1086, 2006 WL 1214994, at *10 (D. Utah, May 5, 2006)). Though he appears to be neither the architect of the conspiracy nor a seasoned con artist, the defendant nonetheless played an integral role in attempting to defraud investors of millions of dollars and did so with a high degree of scienter. As the actual stockholders, he and Baldassarre also stood the most to gain. As discussed, there is also at least a reasonable likelihood that the defendant will engage in similar misconduct again. Accordingly, the court recommends that the defendant be permanently barred from participating in an offering of penny stock, including by engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of any penny stock, as defined in Section 3(a)(51) of the Exchange Act, 15 U.S.C § 78(c)(a)(51).

## C. Disgorgement

The SEC seeks to disgorge the defendant of his ill-gotten profits. Specifically, the SEC's Memorandum of Law, Dkt. Ent. 30-1, as modified by their subsequent Motion to Amend, Dkt. Ent. 31, asserts that the FBI paid the defendants $31,775 for 90,000 shares of their Dolphin stock in order to effectuate its "sting" operation. The SEC therefore requests that the defendant be disgorged of that amount. However, the SEC has not supplied any evidence, by affidavit or otherwise, indicating that these payments were ever made. Without such an evidentiary proffer, the court lacks an independent factual basis upon which to confirm the Commission's entitlement to the requested relief. *See* Fed. R. Civ. P. 55(b); *SEC v. Mgmt. Dyn., Inc.,* 515 F.2d 801, 814 (2d Cir. 1975) ("[U]nless the amount of damages are absolutely certain, the court is required to make an independent determination of the sum to be awarded."). The SEC should be given the opportunity to supplement the record in order to establish a factual basis for their requested relief, and the court

proceeds with its disgorgement analysis below assuming, *arguendo*, that the SEC's allegations regarding the defendant's profits are accurate and that it will supplement the record accordingly. Should the SEC fail to do so, the court recommends that its request for disgorgement be denied.

Courts have broad equitable power to fashion appropriate remedies for federal securities violations, including by ordering the disgorgement of the defendant's profits. *SEC v. First Jersey Sec., Inc.,* 101 F.3d 1450, 1474 (2d Cir. 1996). The purpose of disgorgement is to make violations of the securities laws unprofitable by stripping violators of their ill-gotten gains. *Id.* To this effect, courts enjoy broad discretion in determining the appropriate amount to be disgorged. *Id.* at 1475. "The amount of disgorgement ordered 'need only be a reasonable approximation of profits causally connected to the violation,' " and " 'any risk of uncertainty [in calculating disgorgement] should fall on the wrongdoer whose illegal conduct created that uncertainty.' " *First Jersey,* 101 F.3d at 1475 (quoting *SEC v. Patel*, 61 F.3d 137, 139-40 (2d Cir. 1995).

Here, the SEC initially sought to disgorge the defendant of $38,100, which is the total amount the FBI apparently paid for 105,000 shares of Dolphin stock during its sting operation. Pl.'s Mot. 13-14, Dkt. Ent. 30. Because 15,000 of the FBI's buy orders were ultimately filled by unrelated third parties, however, the SEC reduced its request to $31,775, representing the amount the FBI paid to the actual defendants for their 90,000 shares. Dkt. Ent. 31. In fact, the defendants' profits are even less. Assuming that the SEC's account is correct, the defendants' profits are not the entire amount they received from the FBI, but rather that amount minus the amount returned to the FBI by way of the pre-arranged 30% kickback payment made to their agent, Individual A. Compl. ¶ 45. Subtracting this $11,440 kickback payment, the defendants actually profited in the amount of $20,335.[2] Therefore, provided that the SEC provides a proper evidentiary basis to support its

---

[2] It may be further argued that the defendants' profits are reduced by the true market value of the 90,000 shares of Dolphin stock which they relinquished in consideration for the FBI's $31,775. However, the defendant has waived the opportunity to present this argument by failing to appear in court. *See First Jersey,* 101 F.3d at 1475 ("[A]ny risk of

account of these transactions, the court respectfully recommends that the defendant be ordered to forfeit $20,335 of his ill-gotten gains to the SEC.[3]

## D. Prejudgment Interest

In connection with their request for disgorgement, the SEC also asks the court to award the prejudgment interest attributable to the defendant's unlawful profits. "The decision whether to grant prejudgment interest and the rate used if such interest is granted are matters confided to the district court's broad discretion." *First Jersey,* 101 F.3d at 1476 (quoting *Endico Potatoes, Inc. v. CIT Group/Factoring, Inc.,* 67 F.3d 1063, 1071-72 (2d Cir. 1995)). Factors a court should consider include "(i) the need to fully compensate the wronged party for actual damages suffered, (ii) considerations of fairness and the relative equities of the award, (iii) the remedial purpose of the statute involved, and/or (iv) such other general principles as are deemed relevant by the court." *First Jersey,* 101 F.3d at 1476 (quoting *Wickham Contracting Co. v. Local Union No. 3,* 955 F.2d 831, 833-34 (2d Cir.), *cert. denied,* 506 U.S. 946 (1992). Where enforcement is brought by a regulatory agency, the remedial purpose of the statute becomes a particularly important factor. *First Jersey,* 101 F.3d at 1476. Here, because the purpose of disgorgement is to deprive those who violate federal securities laws of their ill-gotten profits, it is appropriate to account for the prejudgment interest attributable to such profits. *Id.* Such interest should be calculated according to the IRS underpayment rate, since "[t]hat rate reflects what it would have cost to borrow the money from the government and therefore reasonably approximates one of the benefits the defendant derived from its fraud." *First Jersey,* 101 F.3d at 1476; *see also, SEC v. Drexel Burnham Lambert, Inc.,* 837 F. Supp. 587, 612 n.8 (S.D.N.Y. 1993)

---

uncertainty [in calculating disgorgement] should fall on the wrongdoer whose illegal conduct created that uncertainty") (quotation marks and citation omitted). Accordingly, the court proceeds under the assumption that the Dolphin stock was of negligible value at the time of sale.

[3] The court further notes that, in order to resolve his parallel criminal trial, the defendant has already agreed to be held jointly and severally liable with his co-defendants for a forfeiture order in the amount of $26,610. *See United States v. Stockdale,* No. CR-11-0801 (E.D.N.Y. Jan. 24, 2014), Dkt. Ent. 193. If Judge Ross should adopt the court's disgorgement recommendation, it is left to her discretion whether this amount should be deemed fully satisfied by the defendant's criminal forfeiture order, as the court has done with his co-defendants, *see* Dkt. Ents. 36, 37, or whether he should be held independently liable for this amount.

(citing cases), *aff'd*, 16 F.3d 520 (2d Cir. 1994), *cert. denied*, 513 U.S. 1077 (1995). The IRS underpayment rate is currently 3.25%. *See* 26 U.S.C. § 6621; Rev. Rul. 2014-1 (IRS RRU), 2014-2 I.R.B. 263, 2013 WL 6703484. Accordingly, upon a proper evidentiary proffer, the defendant should be made to pay an additional $2,643.55 in prejudgment interest, comprising four years of interest on their initial $20,335 profit.

### E.  Civil Penalty

Finally, the SEC seeks the maximum allowable civil penalty of $150,000. Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d), each adjusted for inflation by 17 C.F.R. § 201.1003, authorize courts to impose punitive fines in order to deter violations of the securities laws and thereby help foster a stable and efficient securities market. *SEC v. Metcalf*, No. CV-11 -493, 2012 WL 5519358, at *7 (S.D.N.Y. Nov. 13, 2012) (citation omitted). "[B]ecause disgorgement represents merely a return of ill-gotten gains, an additional monetary penalty is necessary to appropriately punish and deter these sorts of fraudulent activities." *SEC v. Forest Res. Mgmt. Corp.*, No. CV-09-0903, 2010 WL 2077202, at *2 (S.D.N.Y. May 18, 2010).

In determining an appropriate award, the court is loosely guided by the applicable penalty provisions, which establish three tiers of permissible penalties based on the nature of the defendant's violation. *See* 15 U.S.C. §§ 77t(d)(2), 78u(d)(2)(B); 17 C.F.R. § 201.1005. A maximum penalty of $7,500 is available under the first tier for any securities law violation. If the violation entailed "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement," the defendant may be fined under the second tier up to $75,000. *Id.* If the violation also "resulted in substantial losses or created a significant risk of substantial losses to other persons," the defendant may then be fined under the third tier up to $150,000. *Id.* Here, the defendant's violation clearly involved fraud and deceit, as the defendants' plan was premised on deceiving individuals into buying their stock by secretly bribing stockbrokers. It is not apparent, however, that the defendants' plan ever progressed

far enough that it caused substantial losses to other persons or created a significant risk thereof.  The SEC contends that "*[i]f successful*, Stockdale's plan would have realized a sale of three to four million dollars of Dolphin stock to Individual A, posing a substantial risk of investor losses."  Pl.'s Mem. 16, Dkt. Ent. 30-1 (emphasis added).  But the defendant's plan was decidedly *unsuccessful*, as it was discontinued after the defendants made a mere $31,775 in trades.  As such, there is no evidence that the matched orders actually affected the market price of Dolphin stock or that any actual buyers other than the FBI purchased the stock at supra-competitive prices or were at risk of doing so. Accordingly, the second tier applies and the maximum civil penalty the court may issue is $75,000.

Having determined the ceiling on permissible penalties, the court turns to the question of what constitutes an appropriate fine "in light of the facts and circumstances" of the case. 15 U.S.C. §§ 77t(d)(2), 78u(d)(3)(B); *see also SEC v. Kern*, 425 F.3d 143, 153 (2d Cir. 2005) ("The tier determines the maximum penalty, with the actual amount of the penalty left up to the discretion of the district court.").  Courts look to a number of factors to determine whether civil penalties should be imposed for securities law violations and in what amount.  These factors include, but are not limited to, "(1) the egregiousness of the defendant's conduct; (2) the degree of the defendant's scienter; (3) whether the defendant's conduct created substantial losses or the risk of substantial losses to other persons; (4) whether the defendant's conduct was isolated or recurrent; and (5) whether the penalty should be reduced due to the defendant's demonstrated current and future financial condition." *SEC v. Opulentica, LLC*, 479 F. Supp. 2d 319, 331 (S.D.N.Y. 2007) (citing cases).

Here, the court finds it appropriate to issue a substantial civil penalty based upon the defendant's high level of scienter, including his decision to flee justice after he was indicted, and the fact that he and Baldassarre, as the stockholders, stood to gain the most from the conspiracy.  At the same time, mitigating factors should also be considered.  Significantly, the defendant has already spent five months in prison followed by a year of supervised release, and was ordered to pay $26,610

in forfeiture to resolve his related criminal charges. *See United States v. Stockdale, et al.,* No. 11-CR-0801 (E.D.N.Y. 2013), Dkt. Ent. 193-1; *see also SEC v. Coates,* 137 F. Supp. 2d 413, 430 (S.D.N.Y. 2001) (civil penalty reduced to reflect five days in jail in connection with securities law violation).

Also significant is the fact that the defendant is a first-time offender who appears to have played only an ancillary role in the conspiracy. It appears from both the SEC's complaint and from telephone transcripts attached to the SEC's instant motion that Baldassarre, Mouallem and Individual A each played important roles in conceiving, planning, and executing the fraud, whereas the defendant had little involvement in the scheme beyond listening passively during conference telephone calls, supplying the stock and hoping to reap the rewards. Particularly unlike Mouallem, who appears to have had some experience in organizing matched trades, the defendant appears to have no such experience, and merely partook in a one-time crime of opportunity that arose from his professional affiliation with his co-defendants. For example, during their March 26 telephone conversation, the defendant told Individual A that he hoped to liquidate his entire holdings, saying, "I'm not a long term player." Brownstein Decl., Ex. H., 24, Dkt. Ent. 30-11. During the same conversation, Baldassarre told Individual A that he and the defendant were relying on Mouallem's expertise to effectuate the trades, stating, "Robert seems to have enough experience at this, and he seems to know what he's doing . . .." *Id.* at 21. These and other statements suggest that though the defendant's actions were fraudulent and unscrupulous, they were also the actions of an opportunist seeking a one-time payout, rather than a career con artist.

The court is therefore inclined to follow the example of *SEC v. Metcalf,* which the SEC relies upon to make its civil penalty request. *See* No. CV-11-493, 2012 WL 5519358 (S.D.N.Y. Nov. 13, 2012). In *Metcalf,* the defendant helped bribe an undercover FBI agent to facilitate at least $150,450 worth of matched orders. However, the court found a $50,000 civil penalty to be sufficient based upon the facts that the defendant was a first-time offender, that "[t]he only violations known to the

court are those in which the Government's Agent . . . participated," and that "there was in the end no harm to the public." *Id.* at *8.  Similarly, in *SEC v. Jadidian*, the defendant also received a civil penalty of $50,000 for receiving $35,000 as part of a kickback/matched order scheme with an undercover FBI agent.  *See* No. CV-08-8079, 2011 WL 1327245 (S.D.N.Y. Mar. 31, 2011).  The court recognizes that with regard to civil penalties, "prior decisions and consent decrees are of little comparative value for any individual matter [because] [e]ach case . . . has its own particular facts and circumstances."  *SEC v. Moran,* 944 F. Supp. 286, 296-97 (S.D.N.Y. 1996).  However, the highly similar facts of these cases, coupled with the particular considerations already discussed, lead the court to conclude that a $50,000 civil penalty is also sufficient in this case.  Accordingly, the court respectfully recommends that the defendant be penalized in the amount of $50,000.

## CONCLUSION

For the reasons stated herein, the court respectfully recommends that the SEC's motion for a default judgment be granted.  The court further recommends that the defendant be enjoined from committing further violations of the federal securities laws and from engaging in future offerings of penny stock, and be assessed a civil penalty of $50,000.  Finally, the court recommends that, upon the SEC's submission of a proper evidentiary basis for its allegations concerning the defendant's profits, the defendant be disgorged of $20,335 in ill-gotten profits plus $2,643.55 in prejudgment interest, for a total award of $70,978.55.  Should the SEC fail to properly augment the record, the order of disgorgement should be denied or modified accordingly.

\*          \*          \*          \*          \*          \*          \*

Any objections to the Report and Recommendation above must be filed with the Clerk of the Court with a copy to the undersigned within 14 days of receipt of this report.  Failure to file objections within the specified time waives the right to appeal any judgment or order entered by the District Court in reliance on this Report and Recommendation.  28 U.S.C. § 636(b)(1); Fed. R. Civ.

P. 72(b); *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1054 (2d Cir. 1993); *Frank v. Johnson*, 968 F.2d 298 (2d Cir. 1992), *cert. denied*, 113 S. Ct. 825 (1992); *Small v. Secretary of Health and Human Serv.*, 892 F.2d 15, 16 (2d Cir. 1989) (per curiam).

**Counsel for the plaintiff shall serve a copy of this Report and Recommendation on the defendant by overnight mail and file proof of such service in the record.**

Respectfully recommended,

*Viktor V. Pohorelsky*

VIKTOR V. POHORELSKY
United States Magistrate Judge

Dated: Brooklyn, New York
      April 15, 2014